**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

APPLIED ENERGETICS, INC.,

                                        Plaintiff,                    **21-CV-00382 (VF)**

                        -against-                                     **OPINION AND ORDER**

GUSRAE KAPLAN NUSBAUM PLLC, and
RYAN WHALEN,

                                        Defendants.
----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge.**

Plaintiff Applied Energetics, Inc. ("AE") commenced this action on January 15, 2021,

asserting a claim for legal malpractice and seeking rescission and recoupment of legal fees from

Defendants Gusrae Kaplan Nusbaum PLLC ("GKN") and Ryan Whalen ("Whalen"). ECF No. 1.

Currently pending before the Court are the parties' cross-motions for summary judgment. ECF

Nos. 86-87. For the reasons set forth below, the parties' cross-motions for summary judgment

are **DENIED**.

## BACKGROUND

I.    Factual Background[1]

AE is a publicly traded weapons manufacturer and defense contractor headquartered in

Tucson, Arizona. ECF No. 87-44 at ¶ 1. Defendant GKN is a law firm, and Defendant Ryan

Whalen is a partner at GKN. Id. at ¶¶ 11-12; ECF No. 86-37 at ¶ 3.

In 2014, the United States underwent a budget sequestration, cutting off funding for

experimental programs, effectively reducing AE to a shell company. ECF No. 87-44 at ¶ 2. At

---

[1] Unless otherwise noted, the facts recounted herein reflect admissible evidence in the
record and the undisputed, material facts contained in the parties' Local Civil Rule 56.1
Statements of Facts. See ECF No. 86-37 (Plaintiff's R. 56.1); ECF No. 87-44 (Defendants' R.

that point, George Farley was Plaintiff's chief executive officer. Id. at ¶ 3. Until March 11, 2018, Farley was AE's only employee and the sole member of the board of directors. Id.; see also ECF No. 99-3 at ¶ 3.

On March 21, 2016, Farley filed a certificate of amendment, authorizing an increase of AE's common stock from 125,000,000 to 500,000,000. ECF No. 87-44 at ¶ 4. On March 23, 2016, Farley issued 5 million AE shares to himself and 20 million shares to AnneMarieCo LLC, an entity owned by one of Farley's family members, at par value for $0.001 per share. Id. at ¶ 5; ECF No. 86-37 at ¶¶ 2, 19. Also in March 2016, AE entered into two separate retainer agreements with attorney Mary O'Hara, through the law firms with which she was affiliated, Griffitts O'Hara LLP and Masur Griffitts + (collectively, "Griffitts O'Hara"). ECF No. 87-44 at ¶ 6. O'Hara and Griffitts O'Hara were retained to provide legal services for the preparation and issuance of an opinion of counsel to AE's transfer agent regarding the valid issuance of the newly authorized shares, as well as the preparation and filing of a registration statement on a Form S-1 to file with the Securities and Exchange Commission ("SEC"). Id.

On January 13, 2017, AE shareholders filed a shareholder derivative lawsuit against Farley in the Delaware Court of Chancery, Superius Securities Group, Inc. et al. v. George Farley et al., Case No. 2017-0024 (the "Superius Litigation"). ECF No. 86-37 at ¶ 1. The AE

---

56.1); see In re Gen. Motors LLC Ignition Switch Litig., 154 F. Supp. 3d 30, 32 (S.D.N.Y. 2015) (explaining that admissible evidence can be considered at summary judgment). Any facts contested or challenged by pointing to admissible evidence in the record are considered to be disputed and are not included in the facts recounted herein. However, where a party provides only a conclusory denial or fails to include any record citations to certain facts, those facts are deemed admitted. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); see also N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648 (2d Cir. 2005) (finding it within the district court's discretion to deem the moving party's statement of material facts admitted where the opposing party "offered mostly conclusory denials" and "failed to include any record citations").

shareholders accused Farley of breaching his fiduciary duties to AE by issuing 25 million AE shares to himself and AnneMarieCo LLC and issuing 38 million AE shares to others, for par value, $0.001 per share. Id. at ¶ 2.

On February 2, 2017, Farley retained Defendants to represent him individually in the Superius Litigation. ECF No. 87-44 at ¶ 11; ECF No. 86-37 at ¶ 3. Per the engagement letter, Defendants were retained to represent Farley at an hourly rate of $500 for Whalen, $300 for the assigned associate, and $75 for the assigned paralegal. ECF No. 87-44 at ¶ 12.

Meanwhile, on May 24, 2017, the SEC e-mailed a comment letter to O'Hara, raising concerns about AE's issuance of shares to Farley and AnneMarieCo, LLC. Id. at ¶ 9.

On July 24, 2017, the AE shareholders voluntarily dismissed the Superius Litigation. Id. at ¶ 13. But before the Superius Litigation was dismissed, Defendants accrued approximately 299.1 billable hours and $120,785.17 in fees and costs for their representation of Farley. ECF No. 87-44 at ¶ 14; ECF No. 87-16. It was Defendants' standard practice to send itemized statements to clients reflecting the legal fees incurred in the representation. ECF No. 86-37 at ¶ 9. Farley's insurance carrier paid a portion of the legal fees, but Farley owed Defendants an outstanding balance of $33,324.26. ECF No. 87-44 at ¶ 15. Because the Superius Litigation was voluntarily dismissed, Farley was entitled to indemnification from AE for his attorney's fees. ECF No. 86-37 at ¶ 5.

On September 30, 2017, a Form 10-Q filed with the SEC revealed that AE had only $14,521 in cash equivalents in the third quarter of 2017. ECF No. 87-44 at ¶ 18. At the end of 2017, AE had only $2,7640 in cash equivalents. Id. ¶ 19. AE was therefore unable to pay the outstanding legal fees owed to Defendants for the Superius Litigation. Id. at ¶ 20. Around this time, AE issued several "going concern disclosures," warning shareholders that AE may not be

able to survive financially. Id. at ¶ 21; ECF No. 87-19 at 17. AE also entered into several loans with a direct lender that provided funds to public and private companies. ECF No. 87-44 at ¶ 22. One shareholder capitalized AE with $62,500 in exchange for a 50% discount on AE shares. Id. at ¶ 26.

On January 18, 2018, a group of AE shareholders initiated a proxy solicitation (the "Proxy Solicitation") to remove Farley as director of AE based on the same misconduct alleged in the Superius Litigation. ECF No. 86-37 at ¶¶ 10, 19; ECF No. 87-44 at ¶ 27. On January 29, 2018, AE shareholders involved in the Proxy Solicitation filed a revised preliminary consent statement with the SEC. ECF No. 86-37 at ¶ 12. On February 2, 2018, AE shareholders involved in the Proxy Solicitation filed a definitive consent statement with the SEC pursuant to Schedule 14A of the Securities Exchange Act of 1934. Id. at ¶ 13. The following AE shareholders were listed as proponents of the Proxy Solicitation in the consent statement: Bradford T. Adamczyk, Jonathan R. Barcklow, Thomas C. Dearmin ("Dearmin"), John E. Schultz, Jr., and Oak Tree Asset Management Ltd. Id. The consent statement confirmed that the reason AE shareholders should vote to remove Farley as an AE director was the same misconduct alleged against Farley in the Superius Litigation—namely, issuing himself and family members 25 million AE shares, and 38 million AE shares to others, for par value, $0.001 per share. Id.

Beginning on January 19, 2018, Farley, in his capacity as sole director and officer of AE, retained Defendants to represent AE in the Proxy Solicitation. ECF No. 86-37 at ¶¶ 40, 70. Whalen could not recall GKN conducting a conflict check when AE engaged GKN to represent it in the Proxy Solicitation. Id. at ¶ 24. Whalen personally perceived no conflict in representing Plaintiff, as the Superius Litigation had concluded. Id.; ECF No. 86-5 at 98-102. Whalen understood the scope of GKN's representation of AE in the Proxy Solicitation as twofold: (i) to

disclose to shareholders negative facts about AE shareholder Dearmin, the individual who, if the solicitation succeeded, would replace Farley, and (ii) to try to resolve the Proxy Solicitation without it going to a vote. ECF No. 86-37 at ¶ 75.

In his deposition, Whalen testified that Farley asked Defendants to accept stock in satisfaction of GKN's legal fees. ECF No. 87-14 at 89-90.[2] On January 23, 2018, Farley sent an e-mail to AE's accountant, copying O'Hara, indicating that Defendants had agreed to accept restricted stock in lieu of cash in satisfaction of the outstanding legal fees owed to Defendants for the Superius Litigation. ECF No. 87-44 at ¶ 31. Defendants agreed to take 1,074,968 shares for the $33,324.26 in accrued legal fees. Id. at ¶ 35. This valuation reflected a 50% discount to the public trading price of AE shares. ECF No. 86-37 at ¶ 29. This was similar to the discounts AE had provided to lenders for warrants to issue shares. ECF No. 87-44 at ¶ 24; ECF No. 87-18 at 11; ECF No. 87-22 at 2.

Also on January 23, 2018, Whalen sent Farley the engagement letter for AE's retention of Defendants in connection with the Proxy Solicitation. ECF No. 87-44 ¶ 33; ECF No. 87-26. Along with the engagement letter, Whalen included an invoice to AE for the legal fees incurred up to that point, from January 19, 2018, to January 22, 2018, amounting to $5,200.00, for services related solely to the Proxy Solicitation. Id. at ¶ 34; ECF No. 87-27.

On January 23, 2018, Farley sent an e-mail to AE's accountant, stating that Defendants had agreed to accept restricted AE shares at a 50% discount from the public trading price as payment for their legal fees. ECF No. 86-37 at ¶ 41. The e-mail instructed the accountant to prepare a letter of intent to issue 1,074,968 shares to Defendants. Id. at ¶ 42. O'Hara was copied

---

[2] This fact is not in either parties' Rule 56.1 statements. But the Court may rely on any admissible "evidence in the record" on a motion for summary judgment. Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., 578 F. Supp. 3d 467, 478 n.3 (S.D.N.Y. 2022); Fed. R. Civ. P. 56(c)(3).

on the e-mail to the accountant. ECF No. 86-15 at 1. In the same e-mail, Farley directed O'Hara to issue the necessary legal opinion to the transfer agency. ECF No. 86-37 at ¶ 42; ECF No. 86-15 at 1. GKN had agreed to combine the balance of $5,200.00 in fees owed by AE for the representation in the Proxy Solicitation with the $33,324.26 owed by Farley for the representation in the Superius Litigation, "at the request of AE," leading to an increase in the total amount owed to Defendants and an increase in the number of shares, from 1,074,968 to 1,242,710. ECF No. 87-44 at ¶¶ 34-35.

Also on January 23, 2018, Whalen sent an e-mail to Farley, instructing Farley to transfer 60% of the shares to GKN and the remaining 40% of the shares to Whalen. ECF No. 86-37 at ¶ 46. Farley then forwarded Whalen's e-mail to AE's accountant, instructing him to revise the letter of intent to reflect the instructions given by Whalen regarding the distribution of shares between GKN and Whalen. Id. at ¶ 47. On January 24, 2018, Farley issued the letter of intent to AE's stock transfer company authorizing the issuance of 1,242,710 common stock to Defendants with a "restrictive legend." ECF No. 87-44 at ¶ 38; ECF No. 86-37 at ¶ 49. The restrictive legend indicated that Defendants could not sell or otherwise transfer their shares for one year. ECF No. 87-44 at ¶ 58.

On January 30, 2018, O'Hara noted to Farley that the legal fees were in the range of $30,000, but the shares equated to a value of approximately $95,000, reflecting a "substantial difference." Id. at ¶ 39; ECF No. 87-30. Farley reiterated to O'Hara that the "shares were valued at a 50% discount from the previous day's closing price[,] which is the formula[ ] [AE] used in other sales of restricted shares." ECF No. 87-30. Farley "advised [O'Hara] to review the Board Meeting Minutes," which "indicated that AE would provide an offering of shares to [Defendants] at a price of 0.031 per share, in exchange for legal services." ECF No. 87-44 at ¶¶ 40-41.

On February 5, 2018, O'Hara sent an e-mail to Whalen, acknowledging the agreement reached between Defendants and Farley, on behalf of AE, to issue shares to Defendants at a 50% discount to the market value as of January 23, 2018. ECF No. 86-37 at ¶ 50. O'Hara also asked for a copy of GKN's invoice, stating that "she was 'finishing up [her] opinion for [GKN/Whalen's] shares'" and "needed it 'to connect the number of shares with the value.'" ECF No. 87-44 at ¶ 43 (alterations in original); ECF No. 86-37 at ¶ 51. Whalen sent O'Hara the "lump sum" invoice reflecting the outstanding balance due and stated that an invoice for Defendants' work performed representing AE in connection with the Proxy Solicitation would follow. ECF No. 86-37 at ¶¶ 52-53. Later that day, as promised, Whalen sent O'Hara an invoice for work Defendants performed on behalf of AE in the Proxy Solicitation. Id. at ¶ 54.

Also on February 5, 2018, after receiving Whalen's e-mails, O'Hara issued an opinion letter to AE's stock transfer company stating that counsel had "examined AE's amended corporate bylaws, . . . Defendants' invoices for services rendered and such other documents . . . necessary or appropriate for the purpose of [her] opinion." ECF No. 87-44 at ¶ 44 (internal quotation marks omitted). O'Hara's opinion letter authorized the issuance of 1,242,710 shares of restricted stock to Defendants. Id. O'Hara's opinion letter stated that it was about "the issuance of shares of [AE] to [GKN] and . . . Whalen, respectively." ECF No. 86-37 at ¶ 56. The opinion letter asserted that the shares were "duly authorized, validly issued, fully paid and non-assessable, as compensation for services rendered by [Defendants]." ECF No. 87-44 at ¶ 44. The opinion letter authorized the issuance of the certificates for shares with a restrictive legend (id.) and stated that the shares may be "lawfully issued" pursuant to the instructions presented in the letter of intent dated January 24, 2018 from AE. ECF No. 86-37 at ¶ 58. O'Hara described her opinion letter as a "valid issuance opinion," meaning "an opinion that the shares that George

[Farley] had agreed to issue [Whalen] were validly issued, or would be validly issued once the transfer agent issued the certificate." ECF No. 86-37 at ¶ 60 (alterations in original).

A partner at GKN, Martin Kaplan, understood O'Hara's role with respect to the issuance of AE's shares to encompass "pass[ing] and mak[ing] determinations that the issuance of shares in lieu of cash was done properly and consistent with the federal securities laws." Id. at ¶ 64.

On February 28, 2018, AE filed a Form 8-K with the SEC entitled "Response to Amended Schedule 14A filed February 2, 2018," in response to the Proxy Solicitation. ECF No. 87-44 at ¶ 45. The response to the Proxy Solicitation disclosed information about Dearmin and his family, such as the insider trading allegations brought against Dearmin's wife and the gun charges brought against Dearmin. ECF No. 87-33 at 2. With regards to the dissident shareholders' allegations concerning Farley's self-dealing, the response to the Proxy Solicitation stated that "Mr. Farley[,] for his agreements to and efforts in reactivating [AE]'s business, was issued 20 million common shares with a then fair market value of $20,000 in partial satisfaction of accrued compensation," and AE "also issued at the same time 38 million common shares at the same fair market value to attorneys and consultants to obtain necessary services to continue the [AE]'s activities." Id. at 3.

On March 2, 2018, the AE shareholders involved in the Proxy Solicitation filed additional materials in connection with the February 2, 2018 consent statement with the SEC. ECF No. 86-37 at ¶ 17. On March 5, 2018, Whalen sent an e-mail to O'Hara, requesting that her firm send the stock transfer agent a signed opinion letter as soon as possible, and he expressed his desire to complete the transaction quickly "given the current state of things." ECF No. 86-37 at ¶¶ 66-67. Whalen also sent an e-mail to the attorney for the AE shareholders in the Proxy

Solicitation, stating that AE "demands that a revised [14A] be filed and requires that a new proxy solicitation be mailed to shareholders." Id. at ¶ 76.

On March 8, 2018, 1,242,710 restrictive shares were issued to Defendants. ECF No. 87-44 at ¶ 46. The shares were issued at a 50% discount and were valued at $93,3451.86. Id. at ¶ 47. The same day, AE received written consent representing more than 58% of the outstanding shares to adopt the stockholder proposals in the Proxy Solicitation, replacing Farley with Dearmin. Id. at ¶ 48. Immediately after the takeover, the new members[3] of the Board of Directors funded AE with $100,000 because one of AE's loans was about to convert, which would have forced AE to cease to exist. Id. at ¶ 49. Also following the takeover, both Whalen and O'Hara provided legal advice to Farley on how best to proceed with the board transition. ECF No. 87-34.

On March 11, 2018, the new members of the Board of Directors terminated Defendants' representation of AE. ECF No. 87-44 at ¶ 52; ECF No. 86-37 at ¶ 71. On March 19, 2018, AE entered into a new retainer agreement with Griffitts O'Hara, to include general corporate and securities matters. ECF No. 87-44 at ¶ 54. As reflected on invoices, O'Hara performed approximately 40 hours of legal work for AE between March 2017 and March 2018, totaling $21,112.50 in legal fees. Id. at ¶ 55.

In mid-2019, after the one-year period in the restrictive legend expired, Defendants attempted to sell their AE shares (then valued between approximately $323,000 and $521,000). Id. at ¶ 58. On June 24, 2019, AE demanded that Defendants return all 1,242,711 shares due to

---

[3] The dissident shareholders replaced Farley with Dearmin and added additional members to the Board of Directors, including another one of the dissident shareholders, Bradford T. Adamczyk. ECF No. 87-44 at ¶ 52 (referencing the "new Board of Directors"); ECF No. 87-4 at 10 (indicating that Adamczyk joined AE's Board of Directors in March 2018).

alleged violations of the New York Rules of Professional Conduct ("NY RPC").[4] Id. at ¶ 59;
ECF No. 87-37. Defendants subsequently commenced a securities-fraud action in this District
against Plaintiff. ECF No. 87-44 at ¶ 60; see Gusrae Kaplan Nusbaum PLLC v. Applied
Energetics, Inc., et al., No. 19-CV-6200 (DCF) (S.D.N.Y.). That action has since been
voluntarily dismissed. See No. 19-CV-6200 at ECF No. 105 (S.D.N.Y. Aug. 5, 2021).

In 2021, Defendants' broker facilitated the sale of most of Defendants' AE shares, then
valued between approximately $870,000 to $932,000. ECF No. 87-44 at ¶ 61. At present,
Whalen owns 9,000 shares of AE stock, and GKN owns 100 shares. Id. at ¶ 63.

II.    Procedural History

Plaintiff commenced this action on January 15, 2021, asserting a claim for legal
malpractice and seeking rescission and restitution and recoupment of legal fees, based on alleged
violations of the New York Rules of Professional Conduct. ECF No. 1. Plaintiff specifically
alleges that a conflict of interest arose when Defendants undertook the representation of AE in
the Proxy Solicitation in violation of Rule 1.7 of the NY RPC, because there was a significant
risk that Defendants' personal judgment would be adversely affected by their continuing
responsibilities to Farley (a former client) pursuant to NY RPC Rule 1.9. ECF No. 1; ECF No.
87-44 at ¶ 65. Plaintiff further contends that based on this alleged conflict, Defendants
improperly entered into a business transaction with their client when they accepted stock-for-fees
in violation of Rule 1.8 of the NY RPC by negotiating an excessive fee for services they
rendered because the shares were valued at $93,451.86 and the accrued legal fees were
$38,524.26, in violation of Rule 1.5 of the NY RPC. ECF No. 1; ECF No. 87-44 at ¶ 66.

---

[4] AE's letter identified the total number of shares as 1,242,711. ECF No. 87-37 at 1. But
both parties' Rule 56.1 Statements indicate that the number of shares at-issue is 1,242,710. See
ECF No. 87-44 at ¶ 38; ECF No. 86-37 at ¶ 49.

On May 28, 2021, Defendants moved to dismiss the complaint for failure to state a claim. ECF Nos. 25-27. On March 30, 2022, the Court granted in part and denied in part Defendants' motion to dismiss. ECF No. 36. The Court dismissed Plaintiff's claim for rescission and recoupment of legal fees as duplicative to the extent the claim relied on alleged violations of Rules 1.7 and 1.8 of the NY RPC. Id. at 34.[5] Plaintiff's claim for legal malpractice survived the motion to dismiss, as well as the claim for rescission and recoupment of legal fees but only to the extent the claim relied on an alleged violation of Rule 1.5 of the NY RPC. Id. at 34-36. On June 15, 2022, Defendants answered the complaint. ECF No. 43. The parties engaged in discovery from June 2022 through March 31, 2024. See, e.g. ECF Nos. 44, 77.

On October 28, 2024, both parties filed cross-motions for summary judgment. ECF Nos. 86-87. Each party filed their respective opposition brief on February 26, 2025 (ECF Nos. 98-99), and a reply brief in further support of their respective motions on April 24, 2025. ECF Nos. 102-03. The Court heard oral argument on the cross-motions on August 7, 2025. ECF No. 109.

## DISCUSSION

I. <u>Legal Standard</u>

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage . . . is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo, 22 F.3d at 1224. The moving party

---

[5] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the electronically generated pagination in those documents.

bears the initial burden of demonstrating an entitlement to judgment as a matter of law and

identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of

material fact." Celotex, 477 U.S. at 323; see also Jaramillo v. Weyerhaeuser Co., 536 F.3d 140,

145 (2d Cir. 2008).

A fact is material when it "might affect the outcome of the suit under the governing law."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Gayle v.

Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal

quotation marks omitted). In determining whether there are genuine issues of material fact, the

Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236

(2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation

marks omitted); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008) (noting that

the Court must view all facts "in the light most favorable" to the non-moving party). However, a

court is not required to draw any inference that is "blatantly contradicted by the record, so that no

reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." Jaramillo, 536 F.3d at 145. "[A] party may not rely on mere speculation or conjecture

as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines,

593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to

survive a summary judgment motion, the opposing party must establish a genuine issue of fact

by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); see also

Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249 (internal quotation marks and citation omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

## II.    Analysis

"A plaintiff must establish the following elements for a claim of legal malpractice under New York State law: (1) an attorney-client relationship, (2) attorney negligence, (3) that is the proximate cause of a loss, and (4) actual damages." Stonewell Corp. v. Conestoga Title Ins. Co., 678 F. Supp. 2d 203, 208 (S.D.N.Y. 2010). To establish that the attorney was negligent, the undisputed evidence must demonstrate that the attorney's conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (quoting Grago v. Robertson, 49 A.D.2d 645, 646 (3d Dep't 1975)). Under New York law, in analyzing a legal malpractice claim, "[w]hat constitutes ordinary and reasonable skill and knowledge cannot be fixed with precision[ ] but should be measured at the time of representation." Portus Singapore PTE LTD v. Kenyon & Kenyon LLP, 449 F. Supp. 3d 402, 411 (S.D.N.Y. 2020), aff'd, 843 F. App'x 389 (2d Cir. 2021) (internal quotation marks and citations omitted).

A legal malpractice claim fails as a matter of law "[w]here it is apparent that the attorney exercised reasonable judgment as to how to proceed, or where the client cannot establish another requisite element of the claim as a matter of law." Stonewell Corp., 678 F. Supp. 2d at 209.

"[B]ecause the Rules . . . establish standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct." N.Y. State Bar Assoc. N.Y. Rules of Prof'l Conduct Preamble at 4 (2025). A violation of the NY RPC, without more, however, does not "provide a basis for a legal malpractice claim against an attorney or a firm." Sebco Dev., Inc. v. Siegel & Reiner, LLP, 82 Misc. 3d 1212(A), at *10 (N.Y. Sup. Ct. 2024) (slip copy); see also Friedman v. Kuczkir, 272 F. Supp. 3d 613, 635 (S.D.N.Y. 2017) ("Violation of the Disciplinary Rules, standing alone, does not support a claim of legal malpractice."); Schafrann v. N.V. Famka, Inc., 14 A.D.3d 363, 364 (1st Dep't 2005) ("[A]n alleged violation of the Disciplinary Rules [ ], without more, does not support a malpractice claim.").

In legal malpractice cases, "expert testimony is sometimes required to establish the standard of care in the legal profession." Stonewell Corp., 678 F. Supp. 2d at 209. But "expert testimony may be deemed unnecessary where 'the ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service.'" Id. (quoting Nobile v. Schwartz, 265 F. Supp. 2d 282, 288 (S.D.N.Y. 2003)).

As it concerns the first element of a legal malpractice claim, there is no dispute that Plaintiff had an attorney-client relationship with Defendants. See, e.g. ECF No. 86-37 at ¶ 3; ECF No. 87-44 at ¶ 11. That element is thus satisfied.

Turning to the second element, Plaintiff asserts two grounds for Defendants' alleged negligence. First, Plaintiff contends that Defendants violated Rule 1.8 of the NY RPC by entering into a stock-for-fees arrangement with AE, through Farley.[6] ECF No. 86-1 at 23-28.

---

[6] In the complaint, Plaintiff also alleges that the stock-for-fees agreement violated Rule 1.5, which prohibits lawyers from charging excessive fees for their services. See, e.g., ECF No. 1 at ¶¶ 6, 85, 120. Plaintiff did not address this basis for negligence in its summary judgment briefing. See ECF No. 86-1. As such, a legal malpractice claim premised on a violation of Rule 1.5 is deemed abandoned. Frilando v. N.Y.C. Transit Auth., 463 F. Supp. 3d 501, 510 (S.D.N.Y.

And second, Plaintiff claims that Defendants' representation of AE, because of Defendants' prior representation of Farley, created a conflict of interest that violated Rule 1.7 of the NY RPC. See ECF No. 86-1 at 17-20. Plaintiff argues that to competently advise AE in the Proxy Solicitation, Defendants would have been required to probe Farley's prior conduct, but Rule 1.9 would have barred Defendants from using or revealing any information about Farley that they acquired during the course of their representation of Farley in the Superius Litigation. See id. at 15-19. According to Plaintiff, Defendants were thus required to obtain AE's and Farley's informed written consent to the representation for the Proxy Solicitation, which they failed to do. Id. at 19-20.

As it concerns the stock-for-fees arrangement, there is a dispute of fact as to whether, given the circumstances here, Defendants' acceptance of stock in satisfaction of legal fees was negligent where Defendants did not strictly comply with the requirements of Rule 1.8. Stated differently, the extent of O'Hara's involvement in the transaction and whether she acted as independent counsel for AE is in dispute. And O'Hara's involvement is significant because if she in fact acted as independent counsel for AE in the stock-for-fees transaction, then Defendants' failure to advise AE of the need to seek counsel from an independent attorney would not violate Rule 1.8. See infra at Section II.a.

As it concerns Defendants' representation of AE in the Proxy Solicitation, there is a factual dispute concerning the scope of Defendants' representation of AE, which precludes a determination as to whether there was a conflict of interest caused by Defendants' prior representation of Farley. Further, even if negligence were established, there is a factual dispute as to whether Defendants' negligence proximately caused AE any damages and the amount of

---

2020) ("Claims not explicitly raised on summary judgment—when a plaintiff seeks summary judgment on the entire case—are deemed abandoned.").

those damages. See infra at Section II.b. In short, summary judgment is not warranted for either party with regards to Plaintiff's legal malpractice claim premised on violations of Rules 1.7 and 1.8.

a.   *The Stock-For-Fees Transaction*

In the event of a business transaction between a lawyer and client, Rule 1.8 of the NY RPC requires that: (1) the transaction be fair and reasonable, and the terms of the transaction are fully disclosed in writing and reasonably understood by the client; (2) the client is advised in writing to seek counsel and given a reasonable opportunity to seek independent counsel; and (3) the client gives informed consent in writing, signed by the client, to the essential terms of the transaction and the lawyer's role in the same. N.Y. State Bar R.P.C. § 1.8.

Subsection (a)(2) to Rule 1.8 need not be satisfied "if the client is independently represented in the transaction." Id. at § 1.8, cmt. 4. The comment to Rule 1.8 states that the rule's requirements "must ordinarily be met if a lawyer agrees to take stock (or stock options) in the client in lieu of cash fees." Applied Energetics, Inc. v. Stein Riso Mantel McDonough, LLP, No. 19-CV-1232 (AJN), 2020 WL 2833686, at *3 (S.D.N.Y. May 31, 2020) (quoting N.Y. State Bar R.P.C. § 1.8, cmt. 4D). However, if the client is represented by independent counsel in the transaction with the attorney, a lawyer does not violate Rule 1.8 if he failed to advise the client in writing of the need to seek independent counsel. See Schafrann, 14 A.D.3d at 364 (excusing non-compliance with rule governing business transactions between lawyers and clients where the client "had consulted with disinterested third person"). Further, whether the client is "independently represented in the transaction" is "relevant in determining whether the agreement was fair and reasonable to the client." Simon's N.Y. Rules of Prof. Conduct § 1.8, cmt. 4; see

also <u>Schafrann</u>, 14 A.D.3d at 364 (concluding that business transaction was fair where the client "had consulted with a disinterested third person").

There's no dispute that Defendants did not strictly comply with Rule 1.8. For example, it is undisputed that neither Farley nor AE gave informed consent in writing. ECF No. 87-44. Nor is it disputed that Defendants did not advise Farley in writing to seek the advice of independent counsel about the stock-for-fees transaction. ECF No. 98-33 at 22-23; <u>see also</u> ECF No. 87-15 at 4-5.

Plaintiff argues that strict compliance with Rule 1.8 is required and anything less than strict compliance amounts to negligence supporting a claim of malpractice. ECF No. 86-1 at 23-26. Plaintiffs also point to case law that suggests that strict compliance with the applicable rule of professional conduct governing business transactions between lawyers and their clients is required. <u>See, e.g.</u>, <u>Att'y Grievance Comm'n of Maryland v. Shapiro</u>, 108 A.3d 394, 407 (Md. 2015) (holding that lawyer fell short of his duty "by not advising [his client] in writing of the desirability of seeking independent counsel prior to entering into the [business transaction] with [the lawyer]" and thus failing to comply with Maryland's version of Rule 1.8); <u>L. Offs. of Peter H. Priest, PLLC v. Coch</u>, 780 S.E.2d 163, 173 (N.C. Ct. App. 2015) (holding that business agreement between a lawyer and his client was unenforceable because the lawyer did not comply with the technical requirements of North Carolina's Rule 1.8). Case law in this District and elsewhere, however, suggests that so long as "the intent and purpose of the rule [is] met," a lawyer has not breached the standard of care, such that a technical violation of the rule does not by itself establish negligence. <u>Milo Fields Tr. v. Britz</u>, 874 A.2d 1130, 1138 (N.J. Super. Ct. App. Div. 2005); <u>see also</u> <u>Friedman</u>, 272 F. Supp. 3d at 621; <u>Schafrann</u>, 14 A.D.3d at 364.

In <u>Friedman v. Kuczkir</u>, for example, the court assessed a legal malpractice counterclaim premised on a business transaction between an attorney and a client whereby the attorney received a 11% commission on his client's book sales, for his role as the client's literary agent, in addition to his firm's legal fees for the same work he performed as the client's literary agent. 272 F. Supp. 3d at 621. The attorney did not strictly abide by the predecessor to Rule 1.8, Disciplinary Rule 5-104. <u>Id.</u> at 632. That rule, like Rule 1.8, required a lawyer to "advise[ ] the client to seek the advice of independent counsel in the transaction" and secure "[t]he client['s] consent[ ] in writing, after full disclosure." <u>Id.</u> (internal quotation marks omitted) (quoting N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.23(A) (2007)). The attorney in <u>Friedman</u> neither advised his client to seek the advice of independent counsel, nor was independent counsel involved in consummating the commission agreement. <u>Id.</u> at 621. The attorney even conceded that "he was unaware at the time of the existence of Disciplinary Rule 5-104, which governed business transactions between lawyers and their clients in 2007." <u>Id.</u> The court nonetheless held, after a trial, that the violation of Disciplinary Rule 5-104 was not actionable in a claim for legal malpractice because the client failed to "prove[ ] that they suffered any damages," as they "knowingly paid" the legal fees to which the parties agreed. <u>Id.</u> at 635-36.

Similarly, in <u>Schafrann v. N.V. Famka, Inc.</u>, the court assessed a legal malpractice claim arising out of a business transaction between a lawyer and client, under which the lawyer obtained a 10% interest in the client's entity. 14 A.D.3d at 363-64. The lawyer in <u>Schafrann</u>, like the lawyer in <u>Friedman</u>, failed to comply with Disciplinary Rule 5-104, the predecessor to Rule 1.8. <u>Id.</u> The court held that, while the lawyer's violation of the rule created a presumption of impropriety, the lawyer was able to overcome that presumption at trial by presenting evidence that (1) the transaction was not the result of the lawyer's fraud, influence, or mistake; (2) the

"transaction was well understood by the client"; and (3) the client consulted with an independent third party. <u>Id.</u> at 364. Accordingly, the court held that the lawyer did not act negligently, despite violating Disciplinary Rule 5-104. <u>Id.</u>.

As <u>Friedman</u> and <u>Schaffran</u> illustrate, a claim of legal malpractice premised on a violation of the rules governing business transactions with lawyers fails where the lawyer puts forth evidence to overcome "any presumption of impropriety in the transaction by presenting evidence of lack of fraud, influence, or mistake, and also [evidence] that the transaction was well understood by the client, and that [the client] had consulted with a disinterested third person." <u>Schafrann</u>, 14 A.D.3d at 364. In other words, "evidence showing full and complete disclosure of all facts known to the attorney, absolute independence of action on the part of the client, the fairness and equity of the transaction, the lack of overreaching, and the client's understanding of the importance of independent representation," will overcome the presumption that a business transaction with a client is invalid. <u>Milo Fields Tr.</u>, 874 A.2d at 1138.

Looking at the record as a whole, there is a dispute of fact as to whether, despite Defendants' failure to strictly comply with the requirements of Rule 1.8, the intent and purpose of the rule was satisfied, and AE was advised by an independent counsel (O'Hara) such that Defendants' lack of strict compliance with the requirements of the rule was not negligent. First, it appears from the record that the stock-for-fees transaction was proposed by AE, through Farley; it was not proposed by Defendants. Although not discussed in the parties' Rule 56.1 statements, Whalen testified in his deposition that "Farley requested that [GKN] take restricted stock in lieu of cash [in satisfaction of] the $33,000 [incurred in legal fees]." ECF No. 87-14 at 89-90. Whalen testified that he relayed to Farley that "it's going to be hard to convince my company, [GKN] to accept . . . stock." <u>Id.</u> at 90. Farley, however, "kept on asking [Whalen]" to

"please" accept the stock because AE was "in dire financial straits." Id. After discussing with

another partner at GKN, Whalen told Farley that GKN would accept the stock, but at "a 50

percent discount on the restricted stock, because . . . it can't even be registered for a year and

[AE] might be done by then." Id. at 91.

Second, the 50% discount was similar to the discount given by AE to other lenders.

Before accepting Farley's offer, Whalen reviewed "SEC filings at the time, and [he] saw that in

September . . . or October and again in January, maybe November as well, 2017, that [AE] was

engaging in what is called toxic convertible notes with various different lenders at discounts over

50 percent." Id. at 90. Whalen thus understood that a 50 percent discount was "less than the

discount [Farley] was giving lenders." Id. at 91; see ECF No. 87-20 (term sheet for discounted

stock with lender); ECF 87-32 (Defendants' valuation expert opinion).

Third, the record contains evidence of O'Hara's involvement in the stock-for-fees

transaction. Whalen testified that he orally advised AE, through Farley, that "O'Hara's

involvement, as independent counsel, was absolutely required given Farley's role as the sole

member."[7] ECF No. 98-32 at ¶ 34. Whalen testified that he "recall[ed] having a conversation"

where he "made sure that [AE] was going to have independent counsel represent them in

connection with that issuance of shares." ECF No. 86-5 at 107. Whalen further testified that he

communicated to AE, through a conversation with Farley, that "it was very critical to

[Defendants] that [AE] use Mary O'Hara, who is their corporate and securities counsel, in

connection with issuing the shares on behalf of [AE]." ECF No. 87-14 at 108. Whalen "made

sure that [Farley] immediately informed Mary O'Hara that [Defendants] would be receiving . . .

shares in connection" with the representation, and Whalen told Farley that the stock-for-fees

---

[7] Plaintiff does not dispute that Whalen orally advised Farley to seek the advice of
O'Hara. ECF No. 103 at 8; ECF No. 86-1 at 25-26.

arrangement "[wa]s only happening with Mary O'Hara . . . being counsel on behalf of [AE] in all aspects, in connection with issuing the shares." Id. at 108-09.

Several contemporaneous e-mails appear to support a factual finding that O'Hara was advising AE in connection with the stock-for-fees transaction. For example, O'Hara was included in Farley's e-mail to AE's accountant, where Whalen and Farley discussed the issuance of the shares to Defendants. ECF No. 87-25 at 1. Further, when Farley sent an e-mail to AE's stock transfer agent on January 24, 2018, he stated that "O'[H]ara [would] be forwarding an opinion covering the issuance" of the shares to Defendants. ECF No. 87-29 at 1. The letter of intent attached to that e-mail directed the stock transfer agent to "contact [Farley] or Mary Patton O'Hara." Id. at 2. In a January 30, 2018 e-mail, O'Hara advised Farley that "the legal fees were in the range of $30,000, but the shares equate to around $95,000," reflecting "a substantial difference," "[e]ven with a discount for illiquidity." ECF No. 87-30. Additionally, on February 5, 2018, O'Hara sent an e-mail to Whalen, indicating that she was "finishing up [the] opinion for [his] shares" and asked Whalen to "forward a copy of [his] invoice" so that she could "connect the number of shares with the value to document [her] file." ECF No. 87-31. Relying in part on these e-mails, Defendants' expert opined that "[i]t is reasonable to infer that AE included [ ] O'Hara on these communications so as to have the benefit of her independent advice." ECF No. 87-42 at ¶ 32. Additionally, O'Hara issued the opinion letter, authorizing the issuance of stock to Defendants, as "counsel to [AE]." ECF No. 87-32 at 1.

O'Hara's testimony, however, raises a factual dispute as to her role in the stock-for-fees transaction, given Whalen's testimony and the contemporaneous e-mails just discussed. O'Hara testified that she never "made a determination whether the shares were properly valued for the services performed," and only advised AE insofar as was necessary to issue a "valid issuance

opinion" to authorize the distribution of the shares to Defendants. ECF No. 87-6 at 41, 80-81.

And the testimony of Adamczyk, a dissident shareholder, further supports O'Hara's testimony.

He also testified that O'Hara's role was "strictly to take the data and process the issuance," not to

"see if the shares were issued fairly relative to the shareholders." ECF No. 86-8 at 5.

Additionally, one of Whalen's partners, Kaplan, testified that he understood that O'Hara was

AE's securities counsel whose role with respect to the issuance of AE's shares was to "pass[ ]

and mak[e] determinations that the issuance of the shares in lieu of cash was done properly and

consistent with the federal securities laws." ECF No. 86-6 at 76.

What's more, O'Hara's opinion letter, consistent with her testimony, suggests that the

opinion was limited solely to the validity of the stock issuance. The opinion letter included the

following disclaimer: "The opinion set forth in this letter deals only with the specific legal issue

or issues it explicitly addresses and does not address any other matter." ECF No. 87-32 at 2. [8]

Plaintiff's expert, consistent with O'Hara, opined that the disclaimer reflected that O'Hara "was

*not* considering anything about the stock-for-fees transaction other than the legal ability of [AE]

to issue the shares." See ECF no. 86-9 at ¶ 62 (emphasis in original). However, Defendants'

expert disagreed, opining that "it is reasonable to infer that . . . O'Hara was evaluating the

legality of the transaction from all relevant legal perspectives" because "O'Hara's formal opinion

does not expressly limit its applications to securities law, nor does it exclude other legal

considerations, such as fiduciary law or compliance with attorney regulations." See ECF No. 87-

42 at ¶ 34.

---

[8] The opinion letter was issued on Griffitts O'Hara letterhead, before O'Hara was
employed at AE as AE's in-house counsel. See ECF Nos. 87-8, 87-9, 87-32. O'Hara, at the time
the opinion letter was issued, was therefore a "disinterested third person," Schafrann, 14 A.D.3d
at 364, as she was acting as outside counsel for AE. It was not until January 1, 2022, that O'Hara
became AE's general counsel and chief legal officer. ECF No. 87-5 at 22.

The relevant inquiry is whether Defendants' failure to strictly adhere to the requirements of Rule 1.8 was reasonable given what Defendants knew at the time of the transaction and in light of O'Hara's involvement in the transaction. See Portus Singapore PTE LTD, 449 F. Supp. 3d at 411 (explaining that whether conduct constitutes malpractice is "measured at the time of representation"). As it concerns that inquiry, an issue of fact exists as to the extent of O'Hara's role advising AE in the transaction. The record contains contradictory evidence regarding the scope of O'Hara's involvement in negotiating and executing the stock-for-fees agreement. And the role O'Hara played in the transaction is significant in determining whether Defendants had to advise AE in writing to seek independent counsel and whether the transaction as a whole was fair and reasonable. A fact finder could assess the documentary evidence and testimony and conclude that the purpose and intent of Rule 1.8 was satisfied because the transaction was fair, AE adequately understood its terms, there was no overreaching by Defendants, and AE was advised by independent counsel. But on summary judgment, the Court cannot make that factual finding. Because there is a genuine dispute of material fact regarding whether Defendants acted negligently when entering into the stock-for-fees transaction with Plaintiff, summary judgment is improper on Plaintiff's claim based on a violation of Rule 1.8. Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd., No. 07-CV-7983 (DAB), 2019 WL 13183563, at *7 (S.D.N.Y. Jan. 31, 2019) (denying summary judgment where there were "genuine issues of material fact about whether" defendant lawyer and law firm acted reasonably); Gillaizeau v. Marvin M. Mitchelson, a Pro. Corp., No. 83-CV-4367 (JFK), 1985 WL 216, at *3 (S.D.N.Y. Jan. 24, 1985) (denying summary judgment on legal malpractice claim and explaining that "[w]hether an attorney's conduct falls below the standard of ordinary care commonly possessed by a member of his profession is generally a question of fact").

b. *Conflict of Interest*

Plaintiff also argues that summary judgment is warranted on its legal malpractice claim premised on Defendants' conflicted representation of AE in the Proxy Solicitation. ECF No. 86-1 at 17-23. Defendants, in turn, argue that summary judgment is warranted in their favor, because there was no conflict of interest. Even if there was a conflict, Defendants argue that Farley effectively waived it. And in any event, Defendants contend that Plaintiff has failed to demonstrate that damages were proximately caused by Defendants' purportedly conflicted representation. ECF No. 87-45 at 27-31. As discussed below, there are genuine issues of material fact regarding (1) whether Defendants' former representation of Farley in the Superius Litigation created a conflict triggering Rule 1.7 and Rule 1.9; (2) whether the resulting conflict was waived; and (3) what, if any, damages resulted from the conflicted representation.

Under Rule 1.7, which governs concurrent conflicts of interest, "a lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." N.Y. State Bar R.P.C. § 1.7(a). Concurrent conflicts of interest "can arise from the lawyer's responsibilities to . . . a former client." Id. at § 1.7, cmt. 1. If there is a concurrent conflict of interest, the representation may nonetheless proceed if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing.

Id. at § 1.7(b).

With regards to conflicts with former clients that do not give rise to concurrent conflicts, Rule 1.9 states that: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."[9] Id. at § 1.9(a).

The material undisputed facts establish that the Superius Litigation and the Proxy Solicitation were substantially related, as both actions were premised on Farley's alleged breach of his fiduciary duties to AE when he issued AE stock to himself and family members at $0.001 per share. ECF No. 86-37 at ¶ 19; ECF No. 87-44 at ¶ 27; see In re Jalicia G., 41 Misc. 3d 931, 937 (N.Y. Fam. Ct. 2013), aff'd, 130 A.D.3d 402 (N.Y. 2015) (explaining that "if the issues in the two cases are identical to each other, or essentially the same, then the matters are said to be substantially related"). The Superius Litigation concerned accusations by AE shareholders that "Farley . . . breach[ed] his fiduciary duties owed to AE by issuing himself 25 million AE shares for par value, $0.001 per share." ECF No. 1 at ¶ 3. Similarly, the Proxy Solicitation concerned the same accusations, as the dissident shareholders sought to remove Farley for the same allegedly self-dealing issuance of shares in breach of his fiduciary duties. Id. at ¶¶ 5-6; see also ECF No. 86-14 at 3 (consent statement for the Proxy Solicitation). Both Plaintiff and Defendants

---

[9] While "Rule 1.7 prohibits a lawyer from opposing a *current* client in any matter," regardless of whether the matter is related or unrelated, Rule 1.9 "permits a lawyer to oppose a *former* client unless the matter is substantially related." Simon's N.Y. Rules of Prof. Conduct § 1.9:2 (emphasis in original). Further, while a current client must consent to a conflict implicated by Rule 1.7, it is the former client that must provide consent to waive a conflict under Rule 1.9. See In re PGH Int'l, Inc., 222 B.R. 401, 407-08 (Bankr. D. Conn. 1998) (interpreting conflicts under parallel Connecticut rules of professional conduct and explaining that Rule 1.7 was not violated where the current client consented to the representation after consultation about the concurrent conflict, but Rule 1.9 was violated where counsel did not receive former client's consent to represent the opposing party in a matter substantially related to the matter in which counsel represented the former client).

acknowledge that the Superius Litigation and the Proxy Solicitation were based on the same fundamental allegations. <u>See</u> ECF No. 86-37 at ¶ 19 (stating that "[the] shareholder [P]roxy [S]olicitation[ ] sought to remove Farley for the exact same conduct that was the subject of the Superius Litigation"); ECF No. 98-32 at ¶ 19 (indicating that Defendants do not dispute paragraph 19 of Plaintiff's Rule 56.1 statement of facts); <u>see also</u> ECF No. 87-44 at ¶ 27 ("[T]he Proxy Solicitation . . . s[ought] to replace Farley as CEO with Thomas Dearmin, based on similar allegations stemming from the Superius Litigation.").

There is a factual dispute, however, concerning the scope of Defendants' representation of AE in the Proxy Solicitation. Defendants contend that their role as counsel to AE in the Proxy Solicitation was limited to making sure that the dissident shareholders "actually disclosed the facts about Mr. Dearmin" regarding his "felony gun charges and insider trading allegations against his then wife, which could be severely detrimental to AE, [and] necessary for shareholders to make an informed decision." ECF No. 87-45 at 28 (citing ECF No. 87-15 at 40). Whalen testified that Defendants were retained by AE in the proxy solicitation to "make sure that the dissident shareholders actually disclosed the facts about . . . Dearmin that [AE and Defendants] believed should be disclosed to the shareholders" and to "try to resolve [the Proxy Solicitation]" without a vote. ECF No. 87-15 at 37-41.

AE's response to the Proxy Solicitation, which Defendants prepared as AE's counsel, supports Whalen's testimony concerning Defendants' limited role. <u>See</u> ECF No. 87-33. In that response, AE disclosed that Dearmin's wife and father-in-law "were the subject of a civil injunction action brought by the [SEC] alleging violations of federal securities laws," such as insider trading. <u>Id.</u> at 2-3. AE also stated that in 2006, Dearmin disclosed non-public information about AE's "device that neutralized improvised explosive devices," resulting in a "public rebuke

[of AE] by then President of the United States, George W. Bush." Id. Finally, AE disclosed that in 2017, Dearmin "discharged a weapon in an apartment." Id. at 3.

The engagement letter does not outline or discuss the scope of Defendants' representation of AE. The only reference to the scope of the work to be performed by Defendants is in the subject line of the engagement letter, which simply states: "Re: [AE's] Response to Consent Statement filed by T. Dearmin, et. al." ECF No. 87-26 at 1. In the first paragraph, the engagement letter states that Defendants were "asked" to "advise" AE "in connection with the above-referenced issue," referring to the letter's subject line. Id.

Plaintiff argues that Defendants were retained, in part, to investigate Farley and thus a conflict existed because Defendants' former representation of Farley in the Superius Litigation prohibited Defendants from investigating his actions with regards to the stock issuance. ECF No. 86-1 at 19. In support of this contention, Plaintiff relies solely on its expert's report. See ECF No. 87-40. Specifically, Plaintiff's expert opined that, "in order to competently advise [AE] regarding the merits of the allegations against . . . Farley in the proxy materials, [D]efendants would be *required* to probe the prior conduct of . . . Farley." Id. at ¶ 31 (emphasis in original); see also id. at ¶ 32 (opining that Defendants' representation of AE in the Proxy Solicitation "*required* [D]efendants to vigorously investigate . . . Farley") (emphasis in original).

But Defendants' expert disagrees, characterizing the opinion of Plaintiff's expert as "pure speculation." ECF No. 87-42 at ¶ 50. Defendants' expert opined that Defendants' representation of AE in the Proxy Solicitation did not create a conflict because "at the time Defendants were retained by AE. . . , AE and Farley's interests were aligned in responding to the Proxy [Solicitation]." Id. at ¶ 44. According to Defendant's expert, Defendants' work in responding to the Proxy Solicitation "focused primarily on ensuring that the voting shareholders were aware of

certain conduct by Thomas Dearmin," and as such, "AE's strategy of responding to the Proxy [Solicitation] by . . . disclosing information about Dearmin's prior conduct to voting shareholders was not materially adverse to Farley." Id. at ¶ 45. In short, the expert testimony, coupled with Whalen's testimony, creates an issue of fact as to the scope of Defendants' representation of AE in the Proxy Solicitation.

Even if it was undisputed that Defendants' representation of AE required a probe into Farley's prior conduct, there is a dispute of fact concerning the extent of damages AE suffered because of Defendants' conflicted representation. "[O]ne proper measure of malpractice damages" is the amount of fees incurred during the conflicted representation. Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (S.D.N.Y. 1997); see also Saint Annes Dev. Co. v. Batista, 165 A.D.3d 997, 998 (2d Dep't 2018) ("[A]n attorney who engages in misconduct by violating the rule against representing clients with conflicting interests is not entitled to legal fees for any services rendered."). Damages can also include fees incurred as a result of the attorney's negligence. See Baker v. Dorfman, 239 F.3d 415, 426 (2d Cir. 2000) (explaining that damages include fees incurred as a "consequence of [the] malpractice").

Here, Plaintiff seeks rescission of the stock-for-fees transaction as damages for the conflicted representation, in addition to the fees incurred in the course of Defendants' representation of AE in the Proxy Solicitation. ECF No. 86-1 at 26-28. But damages must be proximately caused by the attorney's negligence. Flycell, Inc. v. Schlossberg LLC, No. 11-CV-0915 (CM), 2011 WL 5130159, at *7 (S.D.N.Y. Oct. 28, 2011) (explaining that a violation of the NY RPC could only support a malpractice claim if the violation "proximately caused . . . damages"); Red Zone LLC v. Cadwalader, Wickersham & Taft LLP, 45 Misc. 3d 672, 681 (N.Y. Sup. Ct. 2013) (explaining that damages must be a "direct result of the attorneys' actions"). And

the issue of proximate cause is generally "an issue of fact for the jury." Am. Tissue, Inc. v.
Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 91 (S.D.N.Y. 2004); see also
Diamond v. Sokol, 468 F. Supp. 2d 626, 634 (S.D.N.Y. 2006), on reconsideration, No. 05-CV-
4993 (GEL), 2007 WL 9815944 (S.D.N.Y. May 18, 2007) (noting that, under New York law,
whether legal malpractice has been committed "is normally a factual determination to be made
by the jury") (internal quotation marks and citations omitted).

Whether the damages for the conflicted representation are limited to the fees paid by AE
for Defendants' representation in the Proxy Solicitation or also include any harm suffered by
AE's shareholders as a result of the issuance of more stock is an issue of fact for a jury to
determine. See Walker v. Kramer, 162 A.D.3d 827, 830 (2d Dep't 2018) (holding that dispute
over amount of damages created "triable issues of fact"); Portilla v. L. Offs. of Arcia &
Flanagan, 125 A.D.3d 956, 957 (2d Dep't 2015) (determining that, despite contention that
"alleged breach of duty did not cause the plaintiff damages," the lawyers' submissions "failed to
eliminate all triable issues of fact with respect to whether the plaintiff sustained damages
proximately caused by their alleged malpractice"); see also Ulico Cas. Co. v. Wilson, Elser,
Moskowitz, Edelman & Dicker, 56 A.D.3d 1, 13-14 (1st Dep't 2008) (holding that there was a
triable issue over whether legal fees paid for a conflicted lawyer's representation constituted
damages for breach of the duty of loyalty). A jury may determine that the stock-for-fees
transaction is too attenuated from any negligence during the representation of AE in the Proxy
Solicitation, such that damages should be limited solely to the fees incurred in the conflicted
representation. See Windsor Sec., LLC v. Arent Fox LLP, No. 16-CV-1533 (GBD), 2019 WL
1510895, at *11-12 (S.D.N.Y. Mar. 27, 2019) (denying summary judgment on malpractice claim

because proximate cause was a triable issue where the client's own conduct could have severed the causal link between the lawyer's negligence and damages).

The disputed facts surrounding the scope of Defendants' representation and the damages incurred as a result of Defendants' negligence preclude summary judgment. Summary judgment on the legal malpractice claim, to the extent it is predicated on the alleged conflict of interest caused by Defendants' representation of AE in the Proxy Solicitation, is therefore denied.

## **CONCLUSION**

For the foregoing reasons, the parties' cross-motions for summary judgment are denied. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 86 and 87.

**SO ORDERED.**

DATED:      New York, New York
            September 17, 2025

_____
VALERIE FIGUEREDO
United States Magistrate Judge

30